# United States Court of Appeals
# for the District of Columbia Circuit

## No. 20-5143

IN RE MICHAEL T. FLYNN,

*Petitioner.*

*On Petition for a Writ of Mandamus to the United States
District Court for the District of Columbia.*

# BRIEF *AMICI CURIAE* OF ELEVEN MEMBERS OF THE UNITED STATES HOUSE OF REPRESENTATIVES IN SUPPORT OF PETITIONER AND REVERSAL

JEROME M. MARCUS
  *Counsel of Record*
1121 North Bethlehem Pike,
  Suite 60-242
Spring House, Pennsylvania 19477
Tel.: (215) 885-2250
jmarcus@marcusauerbach.com

*Counsel for Amici Members of the
  United States House of
  Representatives*

June 1, 2020



**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

A. Parties and Amici.

The parties, intervenors, and amici appearing before the district court are listed in the Emergency Petition for a Writ of Mandamus filed by Petitioner Michael T. Flynn. In this Court, in addition to the parties, intervenors, and amici listed in the Petition and the present filers, to the best of the knowledge of the undersigned attorney for amici, motions for leave to file amicus briefs have been filed by 16 individuals who served on the Watergate Special Prosecutions Force (the "Watergate Prosecutors"), and by a group of former federal judges.

The amici on behalf of whom this brief is filed are eleven Members of the U.S. House of Representatives: Congressman Louie Gohmert, Congressman Andy Biggs, Congressman Mike Johnson, Congressman Bill Flores, Congressman Jody Hice, Congressman Paul Gosar, Congressman Ted Budd, Congressman Andy Harris, Congressman Ron Wright, Congressman Ralph Norman and Congressman W. Gregory Steube.


B. Rulings Under Review.

The ruling under review is the determination by the District Court to appoint an amicus curiae to advise the trial court on the question whether that court should grant or deny the unopposed Motion of Defendant to Dismiss the Indictment.

C. Related Cases.

This case has not previously been before this Court. There are no pending

related cases.

Dated: June 1, 2020

Respectfully submitted,

By: /s/ Jerome M. Marcus
Jerome M. Marcus
Attorney for Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iv

INTEREST OF AMICI CURIAE ............................................................1

ARGUMENT .........................................................................................2

    I.    CONGRESS HAS GRANTED TO THE ATTORNEY GENERAL
          AND HIS SUBORDINATES THE SOLE RIGHT TO ENFORCE
          FEDERAL CRIMINAL LAW ............................................................ 2

    II.   THE HISTORY OF THE ETHICS IN GOVERNMENT ACT
          PROVISIONS RELATING TO THE APPOINTMENT OF
          INDEPENDENT COUNSEL SHOWS THAT CONGRESS
          EXPLICITLY CHOSE TO REMOVE THE COURTS FROM
          ANY INVOLVEMENT IN THE CONDUCT OF FEDERAL
          CRIMINAL CASES, AND THAT CHOICE MUST BE
          RESPECTED BY THE COURTS ....................................................... 4

    III.  THE LAW OF THE SEPARATION OF POWERS DICTATES
          CLEARLY THAT THE TRIAL COURT HAS SET DOWN
          UPON THE WRONG PATH.............................................................. 7

    IV.  HISTORY REVEALS THE GRAVE DANGERS OF A COURT'S
          ABANDONING NEUTRALITY TO PRESS FOR
          CONVICTION .................................................................................. 10

CONCLUSION .....................................................................................12

# TABLE OF AUTHORITIES

*CASES:*

*In re Olson,*
818 F.2d 34 (D.C. Cir. 1987) ....................................................................4

*Nixon v. Administrator of General Services,*
433 U.S. 425 (1977) ........................................................................... 3, 4

*United States v. Ammidown,*
497 F.2d 615 (D.C. Cir. 1973) ............................................................ 8, 9

*United States v. Cowan,*
524 F.2d 504 (5th Cir. 1975) ................................................. 8, 9, 10, 12

*United States v. Hamm,*
659 F.2d 624 (5th Cir. Unit A, 1981) ................................................ 8, 10

*United States v. Haldeman,*
502 F.2d 375 (D.C. Cir. 1974) ..............................................................11

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) ...............................................................................2

*CONSTITUTIONAL PROVISIONS AND STATUTES:*

U.S. Const., Art. II ................................................................................4

Ethics in Government Act, Title VI, Pub. L. 95-521 .......................... 5, 7

Judiciary Act of 1789 (ch. 20, sec. 35, 1 Stat. 73, 92-93) .......................2

The Act to Establish the Department of Justice (1870)
(ch. 150, 16 Stat. 162) .............................................................................2

28 U.S.C. § 501 ......................................................................................2

28 U.S.C. § 510 ......................................................................................3

28 U.S.C. § 515 ...................................................................................3

28 U.S.C. § 516 ...................................................................................3

***LEGISLATIVE MATERIALS:***

S. Hrg. 106-131, Feb. 24, Mar. 3, 17, 24, and Apr. 14, 1999, *available at* https://www.govinfo.gov/content/pkg/CHRG-106shrg56376/html/CHRG-106shrg56376.htm..........................................................................5

## INTEREST OF AMICI CURIAE

Amici are eleven Members of the U.S. House of Representatives: Congressman Louie Gohmert, Congressman Andy Biggs, Congressman Mike Johnson, Congressman Bill Flores, Congressman Jody Hice, Congressman Paul Gosar, Congressman Ted Budd, Congressman Andy Harris, Congressman Ron Wright, Congressman Ralph Norman and Congressman W. Gregory Steube.

Amici are Members of Congress responsible, under Article I of the Constitution, for enacting legislation authorizing the Executive Branch in general, and the Department of Justice, in particular, to carry out criminal prosecutions, as well as legislation establishing the lower federal courts and investing them with power under Article III of the Constitution to sit in judgment in such prosecutions. As such, amici have an interest in ensuring that the Executive can and does carry out its duty to prosecute federal crimes and that such enforcement is not impeded by improper judicial action. [1]

---

[1] [1] No party's counsel authored this brief in whole or in part. No party, party's counsel, or any other person or entity (other than pro bono counsel for amici) contributed money that was intended to fund preparing or submitting this brief. Counsel for amici certify that a separate brief is necessary in order to present the unique perspective of amici as Members of Congress. Counsel for amici further certify that they inquired whether counsel for Petitioner, and for the government, would consent to the filing of this brief; that Petitioner took no position, but that amici had not received any response to that inquiry from the government by the time of preparation for filing; and that Respondent (the district court) neither opposes nor consents to the filing of briefs by amici. Amici have moved for this Court's leave to file this brief.

## ARGUMENT

## I.  CONGRESS HAS GRANTED TO THE ATTORNEY GENERAL AND HIS SUBORDINATES THE SOLE RIGHT TO ENFORCE FEDERAL CRIMINAL LAW

Justice Jackson's famous *Youngstown* concurrence teaches that the powers of the Executive Branch are at their zenith when the Constitution's grant of authority in Article II is seconded by statutes explicitly vesting power and authority in the Executive. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635-637 (1952). That is emphatically the case here with respect to the power of the Executive Branch in general, and the Justice Department in particular under the direction of the Attorney General, to have the exclusive right and duty to exercise prosecutorial discretion and to control the prosecution of the case against this defendant.

The Office of the Attorney General was created by the Judiciary Act of 1789 (ch. 20, sec. 35, 1 Stat. 73, 92-93).  The Act to Establish the Department of Justice (hereinafter "DOJ Act"), enacted in 1870, (ch. 150, 16 Stat. 162), created that Department as "an executive department of the government of the United States" with the Attorney General as its head.  28 U.S.C. §501.

The Act explicitly vests in the Attorney General the exclusive power to initiate criminal cases:

> The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and

proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.

28 U.S.C. §515. Section 516, entitled Conduct of Litigation Reserved to Justice Department directs:

> the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.

In Section 510, the Act further authorizes the Attorney General to delegate this power to any subordinate:

> The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General.

These provisions create a simple, clearly defined set of responsibilities – an allocation of powers that is completely consistent with the allocation made by the Constitution itself, which directs in Article II that the President alone is charged with the duty to "take care that the laws are faithfully executed."

As the Supreme Court instructed in *Nixon v. Administrator of General Services, 433 U.S. 425 (1977)*, the issue, when any transgression is suspected of the rule barring interference with Article II powers, is "whether a challenged rule 'prevents the Executive Branch from accomplishing its constitutionally assigned functions.'" 433 U.S. at 443 (citing *United States v. Nixon,* 418 U.S. at 711-712). If

the statutes set forth above are to be acknowledged at all, it is apparent that what the

trial court has attempted to do here is exactly what the Supreme Court in *Nixon v.

Administrator* said may not be done.

Indeed, the trial court's clearly stated purpose was precisely to prevent the

Executive Branch from exercising prosecutorial discretion.  By calling for briefing

on whether the court should acquiesce in the Government's decision to dismiss the

indictment in this case, or instead choose some other course opposed by the Attorney

General, the trial court revealed clearly its intention to substitute its own judgment

for the prosecutor's on whether such dismissal should take place.  That is the

dictionary definition of "prevent[ing] the Executive Branch from accomplishing"

the function assigned, exclusively to the Justice Department, by  Congress.

II.    **THE HISTORY OF THE ETHICS IN GOVERNMENT ACT
PROVISIONS RELATING TO THE APPOINTMENT OF
INDEPENDENT COUNSEL SHOWS THAT CONGRESS
EXPLICITLY CHOSE TO REMOVE THE COURTS FROM
ANY INVOLVEMENT IN THE CONDUCT OF FEDERAL
CRIMINAL CASES, AND THAT CHOICE MUST BE
RESPECTED BY THE COURTS**

For the vast majority of U.S. history, federal criminal prosecutions were

initiated and maintained by and at the discretion of the Department of Justice,

pursuant to the Executive's enforcement powers under Article II of the U.S.

Constitution.  *See* U.S. Const., Art. II;  *In re Olson*, 818 F.2d 34, 41–43 (D.C. Cir.

1987). The statutory provisions set out above were the only ones governing control

over the prosecution of federal crimes, even those allegedly committed by high-ranking executive branch officials. Any deviations from this system were accomplished by Executive Order or other unilateral, and temporary, executive action.

In 1978, however, in the wake of the Watergate scandal, Congress tried something new. In Title VI of the Ethics in Government Act, Congress created a mechanism whereby an "independent counsel" could be appointed, upon the request of the Attorney General, by a panel of judges known as the Special Division. *See* Pub.L. 95-521, amending Title 28 of the U.S. Code.

But as the expiration date on the independent counsel provisions of the Act drew near in 1999, it became clear—to a bipartisan assemblage of those tasked with *making* the laws of this country as well as those tasked with *enforcing* them—that the Special Division / Independent Counsel framework was unworkable. In hearings before the Senate Committee on Governmental Affairs on the Future of the Independent Counsel Act,[2] the legislators themselves were clear:

- "[T]his Congress, on a bipartisan basis, cannot believe that this law can be repaired. It is fundamentally, institutionally flawed." Statement of Sen. Torricelli (D-N.J.).

---

[2] S. Hrg. 106-131, Feb. 24, Mar. 3, 17, 24, and Apr. 14, 1999, *available at* https://www.govinfo.gov/content/pkg/CHRG-106shrg56376/html/CHRG-106shrg56376.htm.

- "I made a mistake. Four years ago, I voted to reauthorize this law. A number of my Republican colleagues came to me and said that there had been excessive efforts made under this law that cannot be justified. I thought they overstated the case. They did not. I sit here today readily acknowledging to the Chairman and other Members of the panel that I made a mistake in that vote." Sen. Durbin (D-IL).

- "[I]t is my firm view now, Mr. Chairman, that the time has come to make mid-course corrections. My own view, to summarize the statement that I prepared in the interest of time, my own view is that the act ought to expire." Hon. Howard H. Baker, Jr., (former Senate Majority Leader, R-TN).

In remarks before the House Judiciary Subcommittee in March of 1999, then-Deputy Attorney General Eric Holder echoed the sentiments above: "it takes a close-up view of the operation of the Independent Counsel Act to understand that it has serious flaws. The Department of Justice has reluctantly come to the conclusion that the structural flaws we have identified here cannot be fixed. . . . "[t]he Act was supposed to increase trust in our government; unfortunately, it has diminished it."[3] Independent Counsel Kenneth Starr and Attorney General Janet Reno together "led the way in arguing that the law should be allowed to lapse."[4]

---

[3] Prepared Remarks for Deputy Attorney General Eric Holder, House Judiciary Subcommittee (Mar. 2, 1999, 2:00 P.M.), *available at* https://www.justice.gov/archive/dag/testimony/ictestimonydag.htm (quoting article in the public press by Robert Bork).

[4] https://www.washingtonpost.com/wpsrv/politics/special/counsels/stories/counsel063099.htm

And so Congress decided.  The legislature thus made a well-documented, bipartisan judgment to reject division of the power to prosecute, and the investment of part of that power in the courts – through the Ethics in Government Act provision directing judicial appointment of a Special Prosecutor upon motion of the Attorney General.  Congress has instead chosen to return to the regime set forth in the Act to Establish the Department of Justice, which vests exclusive power in the Attorney General to control all criminal cases, including this one.

### III. THE LAW OF THE SEPARATION OF POWERS DICTATES CLEARLY THAT THE TRIAL COURT HAS SET DOWN UPON THE WRONG PATH

Because the basic separation of powers principles are clear, and are addressed in the brief submitted on behalf of General Flynn, we believe it will be helpful to this Court to address the submission of The Watergate Prosecutors, who have chosen to file an amicus brief of their own.  That brief marshals not even one case doing what those amici ask this Court to do -- deny a motion to withdraw a guilty plea when the government consents to that motion.  On the contrary:  the actual result in all of the Watergate Prosecutors' cases on point are the reverse of what they ask this Court to do, and instead exactly what the United States seeks here – reversal of a trial court's refusal to acquiesce in the prosecutor's decision to withdraw an indictment after a finding of guilt.

Thus, for example, in *United States v. Ammidown*, 497 F.2d 615 (D.C. Cir. 1973), this Court reversed a trial court's rejection of the prosecutor's request that an indictment be dismissed -- after conviction – so that the defendant could plead to a lesser charge. And in *United States v. Hamm*, 659 F.2d 624 (5th Cir. Unit A, 1981)(*en banc*), the Fifth Circuit reversed a trial court's rejection of a plea agreement, holding that examination of the prosecution's basis for proceeding as it did was limited to checking whether the prosecutor "has accepted a bribe or because he desires to attend a social event instead of attend upon the court in the trial of the case or because he personally dislikes the victim of the crime." 659 F.2d at 630.

The Watergate prosecutors have left uncited another decision from the Fifth Circuit which is perhaps more relevant. In *United States v. Cowan,* 524 F.2d 504 (5th Cir. 1975), a trial judge denied a Rule 48(a) motion to withdraw a guilty plea in which the government had joined. Instead, the trial judge appointed an amicus to attack the government's position in much the same way that the Watergate Prosecutors do here. Once in place, that court-appointed lawyer "impugn[ed] the good faith of the government['s]" decision to agree with the withdrawal motion i*d.* at 513, suggesting it had been reached for nefarious reasons.

The Executive Branch prosecutors opposed this effort, and when the trial judge rejected their view, they appealed to the Fifth Circuit. In an opinion that states all of the same separation of powers principles that drove the results in *Hamm* and

*Ammidror*, the Fifth Circuit agreed with the Executive Branch prosecutors, overruled the trial judge, and allowed withdrawal of the guilty plea and dismissal of the indictment.

In that case, however, the prosecutors whose judgment was being questioned were the very Watergate Prosecutors who have taken it upon themselves to appear before this Court as amici. The court-appointed lawyer who opposed them had argued that their decision should not be respected by the courts because it "was calculated to facilitate the surreptitious performance of the plea agreement negotiated one month earlier between [defendant] and the Watergate Special Prosecution Force, and thus dispense with the trial of the Texas case." *Id.* at 513-514.

*Cowan* re-emphasizes something that in our day should be, if anything, even more obvious now than it was then: the courts simply cannot put themselves in the position of declaring that some prosecutors are good, and should be trusted, while others are bad, so their prosecutorial judgments will be second-guessed. Judge Hill, the trial judge in the *Cowan* case, did not trust the good faith of the Watergate Prosecutors there before him, and who are now before this Court as amici. He therefore was not prepared to respect their decision that the United States would agree with the defendant that the defendant's plea should be withdrawn and his

indictment dismissed.  The Fifth Circuit instructs us that that is the wrong calculation to make.

As *Cowan* makes clear, a federal judge's declaration that "these prosecutors are good, and I will trust them, while those prosecutors are bad and cannot be relied upon," would not just endanger – it would destroy – the credibility of the one branch of government that has a duty of neutrality.

For let there be no mistake:  when the Watergate Prosecutors' brief repeatedly describes General Flynn as "politically connected," Br. at 2, 5, it is not only, or even primarily, him they are attacking.  Their actual target is the people *to whom* he is said to be politically connected:  the United States Attorney for the District of Columbia, and the Attorney General of the United States.  It is the judgment, and the subjective motivations, of these prosecutors that the Watergate Prosecutors are asking this Court to second-guess.

*Cowan,* and *Hamm*, and the rest of the cases that the Watergate Prosecutors have cited, make clear that down this road lies the complete politicization of the courts.

## IV.    HISTORY REVEALS THE GRAVE DANGERS OF A COURT'S ABANDONING NEUTRALITY TO PRESS FOR CONVICTION

Recently revealed documents regarding the Watergate prosecutions reveal the grave danger posed by the perception that a court has taken sides.  The exhibits attached hereto as Exhibit A, taken from National Archives files relating to the

Watergate Special Counsel, show that a substantial series of *ex parte* meetings took place during the pendency of the Watergate investigation, between the Watergate Prosecutors and then-Chief Judge Sirica.[5] The nature and extent of these meetings was not disclosed at the time.[6] An inquiry to Chief Judge Sirica from counsel for one of the Watergate defendants, asking whether such meetings had occurred at all, is also included here as an exhibit. It was left unanswered. Defendants' request for an evidentiary hearing on, *inter alia*, the nature of these contacts, was denied. This Court affirmed that denial *per curiam* without hearing oral argument, over the vigorous dissent of Judge MacKinnon. See *United States v. Haldeman,* 377 F.Supp. 1312 (D.D.C. 1974), *aff'd*, 502 F.2d 375 (D.C. Cir. 1974)(MacKinnon, J., dissenting).

We call these meetings to this Court's attention only for one purpose: because of the Watergate Prosecutors' decision not to disclose them (and indeed to oppose disclosure) when the meetings took place and when the cases they concerned were still active. They made that decision, there can be no doubt, because public awareness that the court that would sit in judgment had met privately with one side

---

[5] These materials were first brought to light in G. Shepard, The Real Watergate Scandal (Washington, D.C. 2015).

[6] Leon Jaworski's memoir of his work as the Special Prosecutor, The Right and the Power (New York, 1976), references one of these meetings, which took place before a crucial hearing, but says only that it took place to "go over the [hearing's] agenda." See *id.* at 103.

to discuss the assignment of particular judges to particular cases, as well as other important substantive decisions, would have gravely undermined public confidence in the court's impartiality. And upon that impartiality depended – and still depends – the court's legitimacy. If that is lost, all is lost.

Judge Sullivan's orders in this case gravely endanger at least the public appearance of his impartiality. Like Federal District Judge Hill in the *Cowan* case discussed above, Judge Sullivan has made clear that he does not agree with or respect the judgment of the prosecutors before him that a case should be ended. Like Judge Hill, Judge Sullivan has appointed an amicus to attack that decision – something that Judge Sullivan's appointee as *amicus* had already done publicly before he was appointed as Judge Sullivan's amicus-- and to present to Judge Sullivan a different course and authority allowing him to pursue that course.

## CONCLUSION

The Watergate Prosecutors' own actions as prosecutors in the *Cowan* case, and as otherwise discussed above, reflect their insistence that prosecutorial judgments must be respected by the courts. It reflects as well their own acute awareness that no court adjudicating any criminal trial – much less the trial of a high political profile defendant – can be perceived as partial. The judge trying such a case must appear to be, and actually be, neutral.

Judge Sullivan's orders in this case, like his public statements (such as his inquiry as to why General Flynn was not charged with "treason") eliminate, at a minimum, the appearance of his impartiality. Those orders should be reversed. This matter should be assigned to a trial court judge who is, and who appears to be, a neutral decisor between the parties to this case.

When the Watergate Defendants appealed to this Court from Judge Sirica's order refusing to allow investigation into, or full disclosure of, the nature of his contact with the prosecution, the American Civil Liberties Union appeared as an *amicus curiae* in this Court in support of Defendants' effort to find out what had actually happened. The conclusion of that brief, attached hereto as Exhibit B, states matters accurately:

> Particularly where the subject matter of the prosecution involves alleged unlawful conduct by high ranking government officials in the course of their duties, the judiciary should exercise meticulous care to assure that the integrity of the judicial process is not itself brought into question.

Respectfully submitted,

Jerome M. Marcus
    *Counsel of Record*
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
(215) 885-2250
jmarcus@marcusauerbach.com
Counsel to Amici Members of the
United States House of Representatives

Dated: June 1, 2020

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed R. App. P. 17(d)(2)(A) because it contains 2,941 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1). This brief complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times Roman type.

Respectfully submitted,

Jerome M. Marcus
 *Counsel of Record*
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA  19477
(215) 885-2250
jmarcus@marcusauerbach.com
Counsel to Amici Members of the
United States House of Representatives

Dated: June 1, 2020

# EXHIBIT A

WATERGATE SPECIAL PROSECUTION FORCE
United States Department of Justice
1425 K Street, N.W.
Washington, D.C. 20005
December 27, 1973

PAL:sek

Honorable John J. Sirica
Chief Judge
United States District Court
  for the District of Columbia
Washington, D. C.  20001

Dear Chief Judge Sirica:

When Messrs. Ruth, Lacovara, Ben-Veniste and I met with
you and Judge Gesell at your request on Friday, December 14,
you suggested that it would be helpful if we could provide
you with some sense of the caseload that we would be generat-
ing for the Court over the next several months.  I have re-
viewed the status of the investigations currently under way
with my task force leaders, and have put together what I
believe is a reasonable projection of the scale of indict-
ments that may be returned between the beginning of the new
year and the end of April.

In January and February, I foresee the possibility that
the grand juries may return three multi-defendant indictments
that would take approximately a week each to try.  During
that time I can calculate approximately three additional
indictments that might consume two weeks each of trial.
Another case might last for three weeks.  I also anticipate
that, should an indictment be voted in another area actively
under investigation at the present, it would take from four
to six weeks to try the case.  And finally, I believe that
by the end of January or the beginning of February we may
have an indictment in a case that could well take three
months to try.

Looking ahead to March and April, I have reason to
anticipate two or three indictments that may involve one-
week trials, one involving a two-week trial, and another
possibly leading to a three-week trial.  Of course, there
are a number of other matters currently at the preliminary
stages of investigation which might be ready for indictment
during March and April as well.  Added to the cases referred

to above are a number of relatively straightforward cases
that, if not terminated by an agreed upon plea of guilty,
should take no more than a day or two to try.

I am sure you can appreciate that the estimates I have
given are extremely rough. It is, of course, possible that
the grand jury will elect not to return indictments in some
of these areas. In addition, willingness by potential
defendants to agree to plead guilty before or after indict-
ment may substantially reduce the number or length of the
trials. It is my opinion, however, that the estimates I
have given, while perhaps erring on the side of being
overly inclusive, will provide you with information that
you may find helpful in planning for the assignment of
cases during the early part of the new year.

No doubt in making your own assessment of caseload
you will consider the time that will be consumed between
indictments and trials in these cases by pre-trial motions,
particularly motions for continuances or transfers based on
pre-trial publicity, including the report of the Ervin Com-
mittee which is scheduled to be released in the Spring.

If further information or detail would be helpful, I
would be happy to respond to any questions you may have.
Let me take this opportunity to express again my deepest
appreciation for the extremely careful and responsible way
you have been handling these matters and for the courtesies
you have extended to me and to my staff.

Sincerely,

/s/

LEON JAWORSKI
Special Prosecutor


cc: Mr. Jaworski
    Mr. Ruth
    Mr. Lacovara
    Task Force Leaders
    Files

# *Memorandum*

TO : Leon Jaworski
     Special Prosecutor

DATE: January 21, 1974

FROM : Philip A. Lacovara
       Counsel to the Special
       Prosecutor

SUBJECT: Presentment by Watergate Grand Jury Concerning
the President

As part of our consideration of the most appropriate way of
dealing with evidence tending to implicate the President in the
Watergate cover-up, we have discussed the possibility of advising
the grand jury that it may return a presentment setting forth its
views of the President's complicity even though it might be
determined as a matter of law or policy that the President should
not be indicted.  Peter Kreindler was asked to prepare a memoran-
dum on this subject and he has reached the conclusion, reflected
in the attached memorandum, that submission of such a present-
ment by the grand jury would be constitutional.  I have been
discussing this subject with him since the beginning of his
research and am familiar with the authorities.  I agree with his
analysis and conclusions in all respects.

If you agree that presentment in lieu of either indictment
or non-action is the proper mode to pursue, there remains the
question of procedure.  Specifically, the relative rarity with
which presentments are filed in federal courts makes it desir-
able to advise Chief Judge Sirica in advance of this proposed
course.  It would be most unfortunate, for example, for the
grand jury to return a presentment without forewarning and then
have the judge summarily refuse to receive it because of his
lack of awareness of the basis for such a submission.  However,
it is also questionable whether we should discuss this procedure
with the chief judge before the grand jury, whose decision would
be involved, has had an opportunity to consider this possible
course.  Yet there would be some risk in discussing such an
approach with the grand jury, and perhaps planting a seed that
could not be unsown, before the judge has at least tentatively
indicated that he would be prepared to accept such a presentment.

In light of all of the foregoing factors, I recommend the
following course:

   1.  That you decide formally and as quickly as possible
what advice you want given to the grand jury in your capacity
as its counsel on the questions of (a) the President's indict-
ability as a matter of law, (b) the policy factors concerning
indictment of an incumbent President, and (c) the propriety of
the grand jury's submission of a presentment naming the Presi-
dent, either in open court or under seal, with a request that
it be forwarded to the House Committee on the Judiciary.  My
own recommendation is that the grand jury be told (a) we believe
that the President can constitutionally be indicted for the
crime of obstruction of justice but that the question is sub-
ject to considerable doubt, and therefore (b) in light of the
severe dislocations that would immediately flow from the naming
of a sitting President as a criminal defendant, it would be
preferable to leave formal proceedings to the House of Repre-
sentatives.  With regard to (c) the grand jury should be advised
that it may return a presentment, which states its conclusions
based on the evidence it has heard but which does not initiate
a criminal proceeding, and I would propose that the presentment
be submitted under seal to the chief judge, with a request that
it be forwarded to the House Judiciary Committee after counsel
for the President have been given an opportunity to submit any
objections, either on the law or the facts, that they may have.

   2.  After you make the foregoing decisions, I recommend
that you or I or both appear before the grand jury, at the
conclusion of the presentation of the tapes, to advise them
of these determinations.  They should candidly be told that it
is not certain how the court will respond to the submission
of a presentment but should be advised that this matter will
be discussed with the chief judge if the grand jury is inclined
to return a presentment involving the President.

   3.  If the grand jury indicates its tendency toward re-
turning a presentment, we should schedule a conference with
Chief Judge Sirica to apprise him in advance of this possible
development.  I would be prepared to submit a memorandum of law
to him at such a meeting, if he indicated an interest in
receiving it.

4. At any such meeting we should recommend to Judge Sirica that the presentment be received by him under seal, with disclosure only of the fact that the grand jury has made a submission to him, and that the White House be given ten days to review the presentment and to make objections to its filing and transmission.


Attachment


cc:  Mr. Ruth (w/attachment)
     Mr. Kreindler (w/o attachment)
     Mr. Ben-Veniste (w/o attachment)

LJ/flc

Feb ~ry 12/1974

For conf. Watergate file
my

C O N F I D E N T I A L


On Monday, February 11, I met with the Judge at which
time several matters were covered as we sat alone in the jury
room. He again indicated that provided the indictments came down
in time he would take the Watergate Case, stating that he had
been urged to do so by any number of Judges from across the
nation the most recent of them being those who were in
attendance with him at a meeting in Atlanta. He expressed the
opinion that these indictments should be returned as soon as
possible. He also stated that henceforth all guilty pleas
would be taken by him. We talked about the Vesco case and he
merely expressed the thought that perhaps a sealed indictment
might be of some help. He mentioned one or two personal
matters such as an effort to smear him because of a completely
fabricated tale relating to him and his son, of which he
wanted me to be aware. Actually the discussion began with
his unburdening himself to me on that particular matter. He
also mentioned that he had been urged to speak at the State
Bar of Texas in San Antonio and indicated that he would
accept this invitation.

He sought my reaction and I urged him to do so.

The Judge commented upon the status of matters before the grand jury which led into further comments on the possibility of the grand jury considering some type of special report or presentment. He considered this a very touchy problem and cautioned as to what the public's reaction would be to a grand jury stepping out with something that was beyond its normal bounds. He cautioned that the whole effort could be tainted by something irresponsibly being done by the grand jury. He stated that the public would rightfully conclude that the entire proceeding had not been judicious but simply one of wanting to hurt the President. He further said that it was not the function of the grand jury but that of the House Impeachment Committee to express itself on that point. He then told me that in the event I observed anything along that line being considered by the grand jury that he thought it would be appropriate for him to meet with the grand jury in camera. I expressed the belief that it was appropriate for the grand jury to refer to having in its possession evidence that it believed to be material and relevant to the impeachment proceedings and to suggest to the Court that it be referred to the House Committee for that purpose. He countered by stating that he believed he should be informed of the discretion that he could exercise in matters of that kind and further requested that I have a memorandum prepared for him that covers this subject. I agreed to have this done.

# Memorandum

TO     :  Leon Jaworski                        DATE:  Feb. 19, 1974

FROM   :  Henry Ruth

SUBJECT:  Vesco Trial

Jim Rayhill called this morning at the request of
Judge Gagliardi to determine if we had a date certain
for the Watergate indictment and, if not, whether we
would state that the Watergate indictment would
definitely be returned before the conclusion of the
Vesco trial.

I told Rayhill that we did not now have such a date
certain, but that the indictment would definitely be
returned before the conclusion of the Vesco trial.

I also stated for Rayhill's information that the
indictment would occur within the next 3 weeks at the
most.

Phil Lacovara joined in the phone call as I was replying
to Mr. Rayhill's questions.

cc:
   Mr. Lacovara
   Mr. Ben-Veniste
   Mr. McBride

2/19/74

Hank: I think you should contact
Rayhill and be more specific. He knew
that barring unforseen circumstances the
indictment will be in week or Thus, & of next week
Judge S. expects that. In view of our knowledge
of this - the argument that it would occur within 3
weeks, maybe misconstrued, should the indictment
come down next week. — (more specific infor.
may expedite the jury
selection )

On the eve of Thursday, February 28, with the Mitchell-Stans jury selected in New York and sequestered, it became apparent that we would move to bring in the Watergate cover-up indictments on Friday morning. After checking with Judge Sirica, the hour of 11:00 a.m. was decided upon. ~~I had previously talked to Judge Sirica about the bringing in of a sealed report by the grand jury, in addition to the indictment, and this had its approval.~~ I made known to him in advance that such a report was forthcoming, ~~so as not to have him startled by this matter.~~

On Thursday evening, February 28, just as I was preparing to leave the office around 6:45, Alexander Haig called saying that there were so many rumors afloat that he was concerned - that he feared unexpected developments, etc. and he wondered if there was anything I could properly disclose. I told him that there was nothing I could disclose as to the contents of the indictment or the report he had heard would be made. I did tell him that if the grand jury made a report, in addition to returning 𝗍𝗈 an indictment, he should expect Judge Sirica, as would I, to accept it and act on it. He stated that he and the White House generally were fully expecting the grand jury evidence to be made available to the House Judiciary Committee - that they realized it belonged there. I suggested to him that the evidence may well have serious repercussions and he stated that he was aware of that. I suggested that he and the President's counsel take a close look at the March 21 meeting and the actions that followed, even though the President took no personal part in the events that followed the March 21 meeting.

Finally, he asked whether there was any indictment contemplated involving present White House aides, inasmuch as he needed to make arrangements to meet the situation. I told him none was contemplated at this time

Twice during the conversation, he said that he really called to tell me that I was a "great American." The second time he mentioned it, I said "Al, I haven't done anything other than what is my duty and I hope to continue to follow that course."

We parted with my again expressing my concern that the President's counsel had not sufficiently and accurately assessed the facts pertaining to the March 21 conference and the events that took place that night. He said it would be again reviewed.

On the morning of March 1, I met with Judge Sirica in chambers at 10:30. We reviewed the agenda consisting of (1) presentation of indictments and sealed special report of the grand jury; (2) unsealing of the special report and reading by Judge Sirica, and the acceptance of the report and its resealing. I told Judge Sirica that I would ask the Court to specially assign the case in view of its length and protracted nature and that I was estimating the case would take three to four months to try. I asked him to tell the grand jury to return in two weeks for further consideration of other matters that had not been disposed of. I had in mind the possibility of perjury indictments. I also asked the Judge for a gag order under Rule 1-27 restraining extra-judicial statements.

Shortly before 11:00, I left Judge Sirica's chambers and went into the courtroom. As I left Judge Sirica's chambers, I heard the Judge tell his marshal not to be nervous. But the Judge showed some signs of nervousness too. He told me that he had not slept since 3:00 that morning. When court opened, Judge Sirica's marshall was so nervous he could hardly speak the ritual followed in opening a court.

After opening, Judge Sirica looked at me, asked if I had anything to take up with the court. I then rose, went to the lectern, and said: "May it please Your Honor, the grand jury has an indictment to return. It also has a sealed report to deliver to the Court." The rest of the agenda was then followed including delivery of a briefcase of material, along with the special report to the Court - also a key to the briefcase. The Judge indicated that he would have an order on the special report by Monday (he told me he would transmit to the counsel for the House Judiciary Committee under rules that would not interfere with the trial of the accused). The Judge in open court asked if I had any further comments, and I stated: "Due to the length of the trial, conceivably three to four months, it is the Prosecution's view that under Rule 3-3(c), this case should be specially assigned, and we so recommend." This meant that Judge Sirica could assign the case to himself, which he did do by order later entered that day.

The Judge then announced his gag rule and then adjourned court.

We met in the Judge's chambers. I told him I thought all went smoothly. He in turn thanked me for my help. The Judge was

leaving today to speak at the University of Virginia tomorrow, to be back on Sunday. I told him I was going to Texas and that I would be back on Tuesday. We both agreed we would call each other in the interim, if necessary.

ROGER J. WHITEFORD 1888-1955
RINGGOLD HART 1888-1955
JOHN J. CARMODY 190-1972
JOHN J. WILSON
HARRY L. RYAN, JR.
JO V. MORGAN, JR.
FRANK H. STRICKLER
WILLIAM E. ROLLOW
CHARLES J. STEELE
JOHN J. CARMODY, JR.
JAMES EDWARD ABLARD
KEVIN W. CARMODY
——
COUNSEL
DONALD L. HERSKOVITZ

LAW OFFICES

WHITEFORD, HART, CARMODY & WILSON

815 FIFTEENTH STREET, NORTHWEST

WASHINGTON, D. C. 20005

202-638-0455

CABLE ADDRESS

WHITEHART WASHINGTON

MARYLAND OFFICE
7401 WISCONSIN AVENUE
BETHESDA, MARYLAND 20014
301-656-5700

JO V. MORGAN, JR.
FRANK H. STRICKLER
WILLIAM E. ROLLOW
CHARLES J. STEELE

March 12, 1974

Honorable John J. Sirica
Chief Judge
United States District Court
United States Court House
Washington, D.C. 20001

Dear Chief Judge Sirica:

      Would you be willing to inform us whether you
were consulted by or whether you conferred with the
prosecutors, the Grand Jury, or the foreman or other member
thereof, regarding the report which the Grand Jury presented
to you in open court on March 1, 1974, before such report
was actually presented; or that you had notice of the Grand
Jury's intention to present such a report prior to its
actually doing so?

                         Respectfully,

                         JOHN J. WILSON

JJW:hie

   cc:  All Counsel

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

-------------------------------------x

UNITED STATES OF AMERICA,                    :

                    Plaintiff,               :

                                             :    Criminal Case

            v.                               :    No. 74-110

JOHN N. MITCHELL, et al.,                    :

                    Defendants.              :

-------------------------------------x


            MEMORANDUM OF AMERICAN CIVIL LIBERTIES UNION,
            AMICUS CURIAE, IN SUPPORT OF JOINT MOTION OF
            DEFENDANTS TO DISQUALIFY THE HONORABLE JOHN
            J. SIRICA AND FOR AN EVIDENTIARY HEARING.


                    Interest of Amicus Curiae


        The American Civil Liberties Union is a private,

non-partisan organization with over 250,000 members

throughout the country.  Its purpose is to defend the

Bill of Rights.  The Union has historically been

specifically concerned with the construction and appli-

cation of the Fifth and Sixth Amendments which, taken

together, supply the constitutional basis for the guaran-

tee of a fair trial for anyone accused of crime.  The

right of a defendant to have his case heard before an

impartial judge is an elementary ingredient of the con-

stitutional requirement of a fair trial.  It is for that

reason that we submit this memorandum.


                        Argument


        Having read the Points and Authorities and Joint

Affidavit filed by defendants in support of their Motion

to Disqualify, we file this memorandum to support defendants' rights to an evidentiary hearing on their motion. If they prove the assertions upon which their motion is grounded we believe the motion to disqualify should be granted.

The disqualification provisions of 18 U.S.C., sections 144 and 455 are mandatory upon a judge who has "a personal bias or prejudice . . . in favor of any adverse party," "a substantial interest," has "been of counsel" or "has been a material witness" in connection with any proceeding before him. The statutes rest upon a fundamental principle of procedural due process frequently applied by the Supreme Court: "No man is permitted to try cases where he has an interest in the outcome." In re Murchison, 349 U.S. 133, 136 (1955). The stringency of this rule "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' Offutt v. United States, 348 U.S. 11." Id., at 136. See also Commonwealth Coatings Corporation v. Continental Casualty Company, 393 U.S. 145, 148 (1968) ("any tribunal permitted by law to try cases or controversies not only must be unbiased, but also must avoid the appearance of bias"); cf. Tumey v. Ohio, 273 U.S. 510 (1927).

The mandatory provisions of the disqualification statutes have been frequently recognized by lower federal courts. In Roberson v. United States, 249 F.2d 737, 741

- 2 -

(5th Cir. 1957), cert. denied, 356 U.S. 919 (1958), the statute was construed to require disqualification if a judge has "a prior knowledge of the facts or prior interest in an issue arising out of them." Similarly, in United States v. Vasilick, 160 F.2d 631, 632 (3rd Cir. 1947), it was held that a district judge who was a district attorney when a criminal defendant was tried and convicted in his jurisdiction should have disqualified himself from a motion to vacate the sentence. The Court of Appeals pointed out that "[i]n reaching this conclusion we desire to make it abundantly clear that we entertain no doubt of the fairness or impartiality of the District Judge." Id. at 632. See also United States v. Maher, 88 F.Supp. 1007 (D. Maine 1950) (former United States Attorney must disqualify himself as judge in any case arising during his tenure as United States Attorney).

If the allegations put forward by defendants as the basis for their motion are proved, we believe the motion should be granted. Particularly where the subject matter of the prosecution involves alleged unlawful conduct by high-ranking government officials in the course of their duties, the judiciary should exercise meticulous care to assure that the integrity of the judicial process is itself not brought into question.

Respectfully Submitted,

MELVIN L. WULF
American Civil Liberties Union
22 East 40th Street
New York, New York 10016

- 3 -

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

Jerome M. Marcus
  *Counsel of Record*
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA  19477
(215) 885-2250
jmarcus@marcusauerbach.com
Counsel to Amici Members of the
United States House of Representatives